**Marcy LaHart**

---

**Subject:**                    FW: 18-5187; Turnipseed v. APMT LLC

---

**From:** James C. Rather, Jr. [mailto:jrather@alker-rather.com]
**Sent:** Friday, June 15, 2018 4:49 PM
**To:** 'Marcy LaHart'; shutton@sherrihuttonlaw.com
**Cc:** 'Monique Bacas'; 'James C. Rather, Jr.'
**Subject:** RE: 18-5187; Turnipseed v. APMT LLC

Ms. LaHart:

Your pleadings did not confuse me.

My client is not seeking "blanket access" to your client's medical records.  My client does not intend to request your client's medical records or ask for detailed information about her alleged disability.  We fully understand, and intend to comply with, the FHA's limitations on what information can be requested from your client's providers.  We also intend to exercise our rights under the FHA to verify this new documentation provided in support of her request.

What your client submitted on June 11, 2018 is indeed new, and the FHA permits my client to verify it.  It is your client's right to withdraw and decline to allow us to do so by refusing to sign the release; however, that is an obstacle of her own choosing.

Please let us know if she changes her mind.  We stand ready and willing to proceed with the verification process, and will continue to engage in the interactive process as set forth above and in our prior correspondence.

Sincerely,

**JAMES C. RATHER, JR.**
Alker & Rather, LLC
4030 Lonesome Road, Suite B
Mandeville, Louisiana 70448
(o) 985-727-7501
(c) 504-481-4118
(f)  985-727-7505
www.alker-rather.com

The information contained in this email is confidential and may privileged under the Attorney-Client privilege, the work product privilege or other statutory privilege. These privileges extend to the work communicated in emails by attorneys at Alker & Rather, LLC as well as by the paralegals and staff. The information in this email is intended for the use of the addressee only and is the property of Alker & Rather, LLC. If the reader of this message is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this email is strictly prohibited and may be unlawful. If you have received this email in error please immediately notify us by telephone at (985) 727-7501.

---

**From:** Marcy LaHart [mailto:marcy@floridaanimallawyer.com]
**Sent:** Thursday, June 14, 2018 3:16 PM

**To:** 'James C. Rather, Jr.'; shutton@sherrihuttonlaw.com
**Cc:** 'Monique Bacas'
**Subject:** RE: 18-5187; Turnipseed v. APMT LLC

I am sorry if my pleadings have confused you. You do not need any release signed in order to contact Mr. Friedman. You were authorized to speak with him a month ago, the invitation is still open. However, given that express invitation, it is disingenuous deny an accommodation based upon inadequate proof of disability. You and your client have been given more than adequate proof of Dory's disability but have chosen not to believe the information you have been given.

To summarize, verification of my client's disability to date already provided to you and Tonti:

1) Her own statement. Per HUD and DOJ: "Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits or **a credible statement by the individual**)." (emphasis added)

2) Three years worth of psychiatric treatment summaries showing she has been under the care of a psychiatrist and on medication for mental impairments the entire time.

3) A letter from a LCSW verifying her need for an assistance animal, as well as an express invitation to contact him for additional information-something you have still not done.
"
4) Records showing my client was involuntarily committed to Seaside Behavioral Center, reason for admit "Gravely Disabled" Diagnosis: Major Depressive Disorder, Recurrent Sever w/o Psychosis" as well as her prescriptions for medications for depression and anxiety.

5) A letter from Dr. Mahoney, a Louisiana licensed psychiatrist, stating she was in the hospital for acute depression and anxiety, which she struggles with on a chronic basis, and that her emotional support dog is essential to her emotional health and daily functioning.


Again-you have failed to indicate any additional information you need that was not already provided.  Given the above information and the still standing invitation to communicate with Mr. Friedman, please explain what additional information you need to confirm that my client is disabled?

Further- I have provided a citation to recent HUD guidance that states "A housing provider may not ask an applicant or tenant to provide access to medical records or medical providers or provide detailed or extensive information or documentation of a person's physical or mental impairments." See also *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277 (11th Cir. 2014) (That it is "incumbent upon" a skeptical defendant "to request documentation or open a dialogue" rather than immediately refusing a requested accommodation, *Jankowski Lee & Associates v. Cisnero*s, 91 F.3d 891, 895 (7th Cir. 1996), does not entitle a defendant to extraneous information. Generally, housing providers need only the information necessary to apprise them of the disability and the desire and possible need for an accommodation. See, e.g., *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (holding in a reasonable accommodation claim brought under the ADA that employers need "enough information to know of both the disability and desire for an accommodation").

Can you provide <u>any authority whatsoever</u> for your statement that Tonti is allowed to verify Ms. Turnipseed's "alleged" disability "by contacting her medical providers?"

Let's be clear, Dory has not made a "new request"- your client has been provided additional information to supplement the already adequate information it was provided weeks ago. Refusing to grant an accommodation knowing full well that Dory was recently involuntarily hospitalized because of her depression and anxiety is more evidence of the "kind of reckless or callous disregard of, or indifference to a plaintiff's rights' that will entitle her to punitive damages.

Again, I want to be crystal clear, given the applicable standard, "documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support," I am having a hard time grasping why the documentation provided to date is inadequate. However,  if there is specific information still needed, I am happy to obtain such information within the parameters HUD and courts have established regarding the appropriate scope of inquiry that can be made by a housing provider. However, demanding blanket access to Dory's mental health care providers or their records as a condition of granting an accommodation has repeatedly be found to violate the FHA.

Marcy I LaHart PA
207 SE Tuscawilla Road
Micanopy, FL 32667
(352) 545-7001
fax  888-400-1464
www.floridaanimallawyer.com

---

**From:** James C. Rather, Jr. [mailto:jrather@alker-rather.com]
**Sent:** Thursday, June 14, 2018 2:42 PM
**To:** 'Marcy LaHart'; shutton@sherrihuttonlaw.com
**Cc:** 'Monique Bacas'; 'James C. Rather, Jr.'
**Subject:** 18-5187; Turnipseed v. APMT LLC

Ms. LaHart:

I want to make sure I understand your position.  Are you refusing my client's request to contact your client's healthcare providers to verify her disability?

If so, not only does this contradict what you wrote in a federal court pleading--claiming my client failed to engage in the interactive process by not contacting Mr. Friedman and her physicians at Ochsner (excerpts attached for your reference)--it's contrary to the law.  My client is allowed to verify your client's alleged disability by contacting her medical providers.  Please advise as my client remains ready and willing to begin the verification process and to consider the new request for accommodation based on the new documents you supplied on June 11, 2018.  However, to do so my client needs the attached release signed by your client.

Sincerely,

JAMES C. RATHER, JR.
Alker & Rather, LLC
4030 Lonesome Road, Suite B
Mandeville, Louisiana 70448

(o) 985-727-7501
(c) 504-481-4118
(f)  985-727-7505
www.alker-rather.com

The information contained in this email is confidential and may privileged under the Attorney-Client privilege, the work product privilege or other statutory privilege. These privileges extend to the work communicated in emails by attorneys at Alker & Rather, LLC as well as by the paralegals and staff. The information in this email is intended for the use of the addressee only and is the property of Alker & Rather, LLC. If the reader of this message is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this email is strictly prohibited and may be unlawful. If you have received this email in error please immediately notify us by telephone at (985) 727-7501.

**From:** Marcy LaHart [mailto:marcy@floridaanimallawyer.com]
**Sent:** Tuesday, June 12, 2018 12:27 PM
**To:** 'James C. Rather, Jr.'; shutton@sherrihuttonlaw.com
**Cc:** 'Monique Bacas'
**Subject:** RE: 18-5187; Turnipseed v. APMT LLC

Mr Rather:  Demanding access to my clients medical records or healthcare providers is not part of an "ongoing interactive process"- it is a violation of the FHA. My client already provided three years worth of summaries of her psychiatric treatment -far more information that Tonti was entitled to. Per HUD Notice FHEO-2013-01:

A housing provider also may not ask an applicant or tenant to provide access to medical records or medical providers or provide detailed or extensive information or documentation of a person's physical or mental impairments. (empasis in the original)

I have attached the actual notice and highlighted the relevant language for your convenience. If your client has specific questions regarding Ms. Turnipseed's disability related need for an accommodation I would be happy to address them, or to obtain the information from her mental health care providers, if necessary.

Marcy I LaHart PA
207 SE Tuscawilla Road
Micanopy, FL 32667
(352) 545-7001
fax  888-400-1464
www.floridaanimallawyer.com

**From:** James C. Rather, Jr. [mailto:jrather@alker-rather.com]
**Sent:** Tuesday, June 12, 2018 1:01 PM
**To:** 'Marcy LaHart'; shutton@sherrihuttonlaw.com
**Cc:** 'James C. Rather, Jr.'; 'Monique Bacas'
**Subject:** 18-5187; Turnipseed v. APMT LLC

Good Morning, Ms. LaHart:

My client has received your client's new request for accommodation of June 11, 2018. My client is reviewing the new materials now. In the meantime, and in conjunction with the ongoing interactive process, we would ask your client to execute the attached Release allowing my client to contact her healthcare providers to verify the disability as permitted by the FHA.

Sincerely,

**JAMES C. RATHER, JR.**
Alker & Rather, LLC
4030 Lonesome Road, Suite B
Mandeville, Louisiana 70448
(o) 985-727-7501
(c) 504-481-4118
(f)  985-727-7505
www.alker-rather.com

The information contained in this email is confidential and may privileged under the Attorney-Client privilege, the work product privilege or other statutory privilege. These privileges extend to the work communicated in emails by attorneys at Alker & Rather, LLC as well as by the paralegals and staff. The information in this email is intended for the use of the addressee only and is the property of Alker & Rather, LLC. If the reader of this message is not the intended recipient you are hereby notified that any dissemination, distribution or copying of this email is strictly prohibited and may be unlawful. If you have received this email in error please immediately notify us by telephone at (985) 727-7501.

**From:** Marcy LaHart [mailto:marcy@floridaanimallawyer.com]
**Sent:** Monday, June 11, 2018 11:13 AM
**To:** 'James C. Rather, Jr.'; shutton@sherrihuttonlaw.com
**Subject:** RE: 18-5187; Turnipseed v. APMT LLC

Mr. Rather- Our client was involuntarily committed last week because of her deteriorated mental state. Please review the attached and let me know if your client will reconsider its refusal to waive the weight restriction so that Ms. Turnipseed may have the therapeutic benefit of residing with her dog Sasha for emotional support.

Marcy I LaHart PA
207 SE Tuscawilla Road
Micanopy, FL 32667
(352) 545-7001
fax  888-400-1464
www.floridaanimallawyer.com



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-2000

OFFICE OF FAIR HOUSING
AND EQUAL OPPORTUNITY

---

**SPECIAL ATTENTION OF:**
HUD Regional and Field Office Directors
of Public and Indian Housing (PIH); Housing;
Community Planning and Development (CPD), Fair
Housing and Equal Opportunity; and Regional Counsel;
CPD, PIH and Housing Program Providers

FHEO Notice: **FHEO-2013-01**
Issued: April 25, 2013
Expires: Effective until
  Amended, Superseded, or
  Rescinded

---

Subject: Service Animals and Assistance Animals for People with Disabilities in Housing and
HUD-Funded Programs

1. **Purpose:** This notice explains certain obligations of housing providers under the Fair
   Housing Act (FHAct), Section 504 of the Rehabilitation Act of 1973 (Section 504), and the
   Americans with Disabilities Act (ADA) with respect to animals that provide assistance to
   individuals with disabilities. The Department of Justice's (DOJ) amendments to its
   regulations[1] for Titles II and III of the ADA limit the definition of "service animal" under the
   ADA to include only dogs, and further define "service animal" to exclude emotional support
   animals. This definition, however, does not limit housing providers' obligations to make
   reasonable accommodations for assistance animals under the FHAct or Section 504.  Persons
   with disabilities may request a reasonable accommodation for any assistance animal,
   including an emotional support animal, under both the FHAct and Section 504.  In situations
   where the ADA and the FHAct/Section 504 apply simultaneously (*e.g.*, a public housing
   agency, sales or leasing offices, or housing associated with a university or other place of
   education), housing providers must meet their obligations under both the reasonable
   accommodation standard of the FHAct/Section 504 and the service animal provisions of the
   ADA.

2. **Applicability:** This notice applies to all housing providers covered by the FHAct, Section
   504, and/or the ADA[2].

---

[1] Nondiscrimination on the Basis of Disability in State and Local Government Services, Final Rule, 75 Fed. Reg.
56164 (Sept. 15, 2010) (codified at  28 C.F.R. part 35); Nondiscrimination on the Basis of Disability by Public
Accommodations and in Commercial Facilities, Final Rule, 75 Fed. Reg. 56236 (Sept. 15, 2010) (codified at 28
C.F.R. part 36).
[2] Title II of the ADA applies to public entities, including public entities that provide housing, e.g., public housing
agencies and state and local government provided housing, including housing at state universities and other places of
education.  In the housing context, Title III of the ADA applies to public accommodations, such as rental offices,
shelters, some types of multifamily housing, assisted living facilities and housing at places of public education.
Section 504 covers housing providers that receive federal financial assistance from the U.S. Department of Housing
and Urban Development (HUD).  The Fair Housing Act covers virtually all types of housing, including privately-
owned housing and federally assisted housing, with a few limited exceptions.

3. **Organization:** Section I of this notice explains housing providers' obligations under the FHAct and Section 504 to provide reasonable accommodations to persons with disabilities[3] with assistance animals. Section II explains DOJ's revised definition of "service animal" under the ADA. Section III explains housing providers' obligations when multiple nondiscrimination laws apply.

## Section I:  Reasonable Accommodations for Assistance Animals under the FHAct and Section 504

The FHAct and the U.S. Department of Housing and Urban Development's (HUD) implementing regulations prohibit discrimination because of disability and apply regardless of the presence of Federal financial assistance.  Section 504 and HUD's Section 504 regulations apply a similar prohibition on disability discrimination to all recipients of financial assistance from HUD.  The reasonable accommodation provisions of both laws must be considered in situations where persons with disabilities use (or seek to use) assistance animals[4] in housing where the provider forbids residents from having pets or otherwise imposes restrictions or conditions relating to pets and other animals.

An assistance animal is not a pet.  It is an animal that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability.  Assistance animals perform many disability-related functions, including but not limited to, guiding individuals who are blind or have low vision, alerting individuals who are deaf or hard of hearing to sounds, providing protection or rescue assistance, pulling a wheelchair, fetching items, alerting persons to impending seizures, or providing emotional support to persons with disabilities who have a disability-related need for such support.  For purposes of reasonable accommodation requests, neither the FHAct nor Section 504 requires an assistance animal to be individually trained or certified.[5]  While dogs are the most common type of assistance animal, other animals can also be assistance animals.

Housing providers are to evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests.  After receiving such a request, the housing provider must consider the following:

---

[3] Reasonable accommodations under the FHAct and Section 504 apply to tenants and applicants with disabilities, family members with disabilities, and other persons with disabilities associated with tenants and applicants.  24 CFR §§ 100.202; 100.204; 24 C.F.R. §§ 8.11,  8.20, 8.21, 8.24, 8.33, and case law interpreting Section 504.
[4] Assistance animals are sometimes referred to as "service animals," "assistive animals," "support animals," or "therapy animals."  To avoid confusion with the revised ADA "service animal" definition discussed in Section II of this notice, or any other standard, we use the term "assistance animal" to ensure that housing providers have a clear understanding of their obligations under the FHAct and Section 504.
[5] For a more detailed discussion on assistance animals and the issue of training, see the preamble to HUD's final rule, Pet Ownership for the Elderly and Persons With Disabilities, 73 Fed. Reg. 63834,63835 (October 27, 2008).

(1) Does the person seeking to use and live with the animal have a disability – *i.e.*, a physical or mental impairment that substantially limits one or more major life activities?

(2) Does the person making the request have a disability-related need for an assistance animal? In other words, does the animal work, provide assistance, perform tasks or services for the benefit of a person with a disability, or provide emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability?

If the answer to question (1) **or** (2) is "no," then the FHAct and Section 504 do not require a modification to a provider's "no pets" policy, and the reasonable accommodation request may be denied.

Where the answers to questions (1) **and** (2) are "yes," the FHAct and Section 504 require the housing provider to modify or provide an exception to a "no pets" rule or policy to permit a person with a disability to live with and use an assistance animal(s) in all areas of the premises where persons are normally allowed to go, unless doing so would impose an undue financial and administrative burden or would fundamentally alter the nature of the housing provider's services. The request may also be denied if: (1) the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation, or (2) the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation. Breed, size, and weight limitations may not be applied to an assistance animal. A determination that an assistance animal poses a direct threat of harm to others or would cause substantial physical damage to the property of others must be based on an individualized assessment that relies on objective evidence about the specific animal's actual conduct – not on mere speculation or fear about the types of harm or damage an animal may cause and not on evidence about harm or damage that other animals have caused. Conditions and restrictions that housing providers apply to pets may not be applied to assistance animals. For example, while housing providers may require applicants or residents to pay a pet deposit, they may not require applicants and residents to pay a deposit for an assistance animal.[6]

A housing provider may not deny a reasonable accommodation request because he or she is uncertain whether or not the person seeking the accommodation has a disability or a disability-related need for an assistance animal. Housing providers may ask individuals who have disabilities that are not readily apparent or known to the provider to submit reliable documentation of a disability and their disability-related need for an assistance animal. If the disability is readily apparent or known but the disability-related need for the assistance animal is not, the housing provider may ask the individual to provide documentation of the disability-related need for an assistance animal. For example, the housing provider may ask persons who are seeking a reasonable accommodation for an assistance animal that provides emotional

---

[6] A housing provider may require a tenant to cover the costs of repairs for damage the animal causes to the tenant's dwelling unit or the common areas, reasonable wear and tear excepted, if it is the provider's practice to assess tenants for any damage they cause to the premises. For more information on reasonable accommodations, see the Joint Statement of the Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations Under the Fair Housing Act*, http://www.hud.gov/offices/fheo/library/huddojstatement.pdf.

support to provide documentation from a physician, psychiatrist, social worker, or other mental health professional that the animal provides emotional support that alleviates one or more of the identified symptoms or effects of an existing disability. Such documentation is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support.

However, a housing provider may not ask a tenant or applicant to provide documentation showing the disability or disability-related need for an assistance animal if the disability or disability-related need is readily apparent or already known to the provider. For example, persons who are blind or have low vision may not be asked to provide documentation of their disability or their disability-related need for a guide dog. A housing provider also may not ask an applicant or tenant to provide access to medical records or medical providers or provide detailed or extensive information or documentation of a person's physical or mental impairments. Like all reasonable accommodation requests, the determination of whether a person has a disability-related need for an assistance animal involves an individualized assessment. A request for a reasonable accommodation may not be unreasonably denied, or conditioned on payment of a fee or deposit or other terms and conditions applied to applicants or residents with pets, and a response may not be unreasonably delayed. Persons with disabilities who believe a request for a reasonable accommodation has been improperly denied may file a complaint with HUD.[7]

## Section II: The ADA Definition of "Service Animal"

In addition to their reasonable accommodation obligations under the FHAct and Section 504, housing providers may also have separate obligations under the ADA. DOJ's revised ADA regulations define "service animal" narrowly as any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. The revised regulations specify that "the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition."[8] Thus, trained dogs are the only species of animal that may qualify as service animals under the ADA (there is a separate provision regarding trained miniature horses[9]), and emotional support animals are expressly precluded from qualifying as service animals under the ADA.

The ADA definition of "service animal" applies to state and local government programs, services activities, and facilities and to public accommodations, such as leasing offices, social service center establishments, universities, and other places of education. Because the ADA requirements relating to service animals are different from the requirements relating to assistance animals under the FHAct and Section 504, an individual's use of a service animal in an ADA-covered facility must not be handled as a request for a reasonable accommodation under the FHAct or Section 504. Rather, in ADA-covered facilities, an animal need only meet the definition of "service animal" to be allowed into a covered facility.

---

[7] Ibid.

[8] 28 C.F.R. § 35.104; 28 C.F.R. § 36.104.

[9] 28 C.F.R. § 35.136(i); 28 C.F.R. § 36.302(c)(9).

To determine if an animal is a service animal, a covered entity shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal.  A covered entity may ask: (1) Is this a service animal that is required because of a disability? and (2) What work or tasks has the animal been trained to perform?  A covered entity shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal.  These are the only two inquiries that an ADA-covered facility may make even when an individual's disability and the work or tasks performed by the service animal are not readily apparent (*e.g.*, individual with a seizure disability using a seizure alert service animal, individual with a psychiatric disability using psychiatric service animal, individual with an autism-related disability using an autism service animal).

A covered entity may not make the two permissible inquiries set out above when it is readily apparent that the animal is trained to do work or perform tasks for an individual with a disability (*e.g.*, the dog is observed guiding an individual who is blind or has low vision, pulling a person's wheelchair, or providing assistance with stability or balance to an individual with an observable mobility disability).  The animal may not be denied access to the ADA-covered facility unless: (1) the animal is out of control and its handler does not take effective action to control it; (2) the animal is not housebroken (i.e., trained so that, absent illness or accident, the animal controls its waste elimination); or (3) the animal poses a direct threat to the health or safety of others that cannot be eliminated or reduced to an acceptable level by a reasonable modification to other policies, practices and procedures.[10]  A determination that a service animal poses a direct threat must be based on an individualized assessment of the specific service animal's actual conduct – not on fears, stereotypes, or generalizations.  The service animal must be permitted to accompany the individual with a disability to all areas of the facility where members of the public are normally allowed to go.[11]

## Section III.  Applying Multiple Laws

Certain entities will be subject to both the service animal requirements of the ADA and the reasonable accommodation provisions of the FHAct and/or Section 504.  These entities include, but are not limited to, public housing agencies and some places of public accommodation, such as rental offices, shelters, residential homes, some types of multifamily housing, assisted living facilities, and housing at places of education.  Covered entities must ensure compliance with all relevant civil rights laws.  As noted above, compliance with the FHAct and Section 504 does not ensure compliance with the ADA.  Similarly, compliance with the ADA's regulations does not ensure compliance with the FHAct or Section 504.  The preambles to DOJ's 2010 Title II and Title III ADA regulations state that public entities or public accommodations that operate housing facilities "may not use the ADA definition [of "service animal"] as a justification for reducing their FHAct obligations."[12]

---

[10] 28 C.F.R § 35.136; 28 C.F.R. § 36.302(c).
[11] For more information on ADA requirements relating to service animals, visit DOJ's website at www.ada.gov.
[12] 75 Fed. Reg. at 56166, 56240 (Sept. 15, 2010).

5

The revised ADA regulations also do not change the reasonable accommodation analysis under the FHAct or Section 504.  The preambles to the 2010 ADA regulations specifically note that under the FHAct, "an individual with a disability may have the right to have an animal other than a dog in his or her home if the animal qualifies as a 'reasonable accommodation' that is necessary to afford the individual equal opportunity to use and enjoy a dwelling, assuming that the use of the animal does not pose a direct threat."[13]  In addition, the preambles state that emotional support animals that do not qualify as service animals under the ADA may "nevertheless qualify as permitted reasonable accommodations for persons with disabilities under the FHAct."[14]  While the preambles expressly mention only the FHAct, the same analysis applies to Section 504.

In cases where all three statutes apply, to avoid possible ADA violations the housing provider should apply the ADA service animal test first.  This is because the covered entity may ask only whether the animal is a service animal that is required because of a disability, and if so, what work or tasks the animal has been been trained to perform.  If the animal meets the test for "service animal," the animal must be permitted to accompany the individual with a disability to all areas of the facility where persons are normally allowed to go, unless (1) the animal is out of control and its handler does not take effective action to control it; (2) the animal is not housebroken (i.e., trained so that, absent illness or accident, the animal controls its waste elimination); or (3) the animal poses a direct threat to the health or safety of others that cannot be eliminated or reduced to an acceptable level by a reasonable modification to other policies, practices and procedures.[15]

If the animal does not meet the ADA service animal test, then the housing provider must evaluate the request in accordance with the guidance provided in Section I of this notice.

It is the housing provider's responsibility to know the applicable laws and comply with each of them.

## Section IV. Conclusion

The definition of "service animal" contained in ADA regulations does not limit housing providers' obligations to grant reasonable accommodation requests for assistance animals in housing under either the FHAct or Section 504.  Under these laws, rules, policies, or practices must be modified to permit the use of an assistance animal as a reasonable accommodation in housing when its use may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling and/or the common areas of a dwelling, or may be necessary to allow a qualified individual with a disability to participate in, or benefit from, any housing program or activity receiving financial assistance from HUD.

---

[13] 75 Fed. Reg. at 56194, 56268.

[14] 75 Fed. Reg. at 56166, 56240.

[15] 28 C.F.R § 35.136; 28 C.F.R. § 36.302(c).

6

Questions regarding this notice may be directed to the HUD Office of Fair Housing and Equal Opportunity, Office of the Deputy Assistant Secretary for Enforcement and Programs, telephone 202-619-8046.

John Trasviña, Assistant Secretary for
Fair Housing and Equal Opportunity